**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

NEWSMAX BROADCASTING, LLC,

       *Plaintiff*

   v.

FOX CORPORATION AND FOX NEWS
NETWORK, LLC,

       *Defendants*.

No. 3:25-cv-770

Hon. William M. Conley

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 3

    A.    Fox News and Newsmax ................................................................... 3

    B.    Distribution of Pay TV Channels ..................................................... 4

    C.    Newsmax's Alleged Market for "Distribution of Right-Leaning Pay TV News" ....................................................................................... 5

    D.    Alleged Anti-Competitive Conduct ................................................. 6

    E.    Newsmax's Antitrust Claims ............................................................ 8

LEGAL STANDARD ................................................................................................... 8

ARGUMENT ............................................................................................................... 9

I.    NEWSMAX'S CLAIMS ALL FAIL BECAUSE IT HAS NOT PLAUSIBLY ALLEGED A RELEVANT MARKET. .......................................... 9

    A.    Newsmax Fails to Allege a Plausible Market Limited to Distribution of "Right-Leaning News." ................................................................. 11

    B.    Newsmax Does Not Plausibly Allege a Market Limited to Distribution of "Pay TV news." ................................................................................... 16

II.    NEWSMAX FAILS TO PLAUSIBLY ALLEGE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT. ........................................................... 19

    A.    Newsmax Fails to State a Claim Based on "Exclusive Carriage" Provisions ........................................................................................ 20

        1.    Newsmax Fails to Plausibly Allege that Exclusive Carriage Provisions Exist ................................................................... 20

        2.    Even If "Exclusive Carriage" Provisions Were Adequately Alleged, Newsmax's Allegations Describe Nothing More than Exclusive Dealing Arrangements that Do Not Violate Section 1 ............................ 22

            a.    Newsmax fails to plead facts plausibly suggesting substantial foreclosure of competition. ......................... 22

            b.    Newsmax has failed to plead injury to competition. ................... 27

B.    Newsmax's Allegations Concerning So-Called "Drag-Down" Provisions Fail To State A Claim. ....................................................... 32

1.    Newsmax Fails to Allege that "Drag-Down" Provisions Even Exist. ...... 32

2.    So-Called "Drag Down" Provisions Fail to State a Claim in Any Event. ................................................................................................. 34

III.    NEWSMAX FAILS TO STATE A CLAIM FOR MAINTENANCE OF MONOPOLY POWER UNDER SECTION 2 OF THE SHERMAN ACT.................... 36

A.    Newsmax Fails Adequately to Allege that Fox News Has Monopoly Power in a Relevant Market.............................................................. 36

B.    Newsmax Fails Adequately to Allege Anticompetitive Conduct or Injury to Competition........................................................................ 40

IV.    NEWSMAX'S TYING ALLEGATIONS FAIL TO STATE A CLAIM...................... 42

A.    Block Booking Is an Outmoded Tying Theory of Liability and Newsmax Fails to Allege Essential Elements for That Theory to Apply in Any Event. ........................................................................ 43

B.    Newsmax's Allegations Otherwise Fail to State a Tying Claim. ......................... 44

V.    NEWSMAX'S STATE LAW CLAIMS FAIL FOR THE SAME REASONS AS ITS CLAIMS UNDER THE SHERMAN ACT. ............................................. 47

CONCLUSION.................................................................................................. 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*42nd Parallel N. v. E St. Denim Co.*,
  286 F.3d 401 (7th Cir. 2002) ................................................................8, 27

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012) ....................................................9, 10, 27, 44

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ..............................................................35

*Am. President Lines, LLC v. Matson, Inc.*,
  633 F. Supp. 3d 209 (D.D.C. 2022) ......................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................8

*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*,
  275 F. Supp. 3d 957 (W.D. Wis. 2017) ..................................................47

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) .....................................................................32

*Ass'n of Am. Physicians & Surgeons v. Am. Bd. of Med. Specialties*,
  15 F.4th 831 (7th Cir. 2021) ..........................................................19, 29

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ...........................................................1, 3

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................ *passim*

*Bootler, LLC v. Google, LLC*,
  No. 24-cv-3660, 2025 WL 2576710 (N.D. Ill. Sept. 4, 2025) ............................29

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .....................................................28, 31, 46

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) .....................................................................30

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ...............................................................9, 10, 13

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ...........................................................17

*Carter Hawley Hale Stores, Inc. v. Limited, Inc.*,
    587 F. Supp. 246 (C.D. Cal. 1984) .....................................................15

*Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*,
    940 F.3d 971 (7th Cir. 2019) ..................................................... *passim*

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
    961 F.2d 667 (7th Cir. 1992) ...............................................................31

*Collins v. Associated Pathologists, Ltd.*,
    844 F.2d 473 (7th Cir. 1988) ...............................................................36

*Colonial Med. Grp., Inc. v. Cath. Health Care W.*,
    444 F. App'x 937 (9th Cir. 2011) .........................................................11

*Contractor Tool Supply, Inc. v. JPW Indus., Inc.*,
    785 F. Supp. 3d 1107 (M.D. Fla. 2025)...............................................29

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)..............................................................................32

*DataCell ehf. v. Visa, Inc.*, No. 14-cv-1658, 2015 WL 4624714 (E.D. Va. July 30,
    2015) ......................................................................................................16

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006)..................................................14

*Ducere LLC v. Enbridge (U.S.) Inc.*,
    No. 24-cv-01217, 2025 WL 81373 (N.D. Ill. Jan. 13, 2025)....................37, 38, 39

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*,
    357 F.3d 1 (1st Cir. 2004)....................................................................42

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
    360 F. Supp. 2d 465 (E.D.N.Y. 2005) .................................................17

*Edgenet, Inc. v. GS1 AISBL*,
    742 F. Supp. 2d 997 (E.D. Wis. 2010).................................................41

*Ehredt Underground, Inc. v. Commonwealth Edison Co.*,
    90 F.3d 238 (7th Cir. 1996) .................................................................28

*Endsley v. City of Chicago*,
    230 F.3d 276 (7th Cir. 2000) ...............................................................40

*FTC v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...................................................................40

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
    416 F. Supp. 3d 1189 (D. Colo. 2019) ....................................................40

*Goodloe v. Nat'l Wholesale Co., Inc.*,
    No. 03-cv-7176, 2004 WL 1631728 (N.D. Ill. July 19, 2004) ...............36

*In re Harley-Davidson Aftermarket Parts Marketing, Sales Practices & Antitrust*
    *Litigation*,
    151 F.4th 922 (7th Cir. 2025) .............................................2, 11, 14, 15

*Havoco of Am., Ltd. v. Shell Oil Co.*,
    626 F.2d 549 (7th Cir. 1980) ...................................................................32

*Hendershot v. S. Glazer's Wine & Spirits of Okla., LLP*,
    No. 20-cv-0652, 2021 WL 3501523 (N.D. Okla. Aug. 9, 2021)............15

*Hennessy Indus. Inc. v. FMC Corp.*,
    779 F.2d 402 (7th Cir. 1985) ...................................................................40

*Hesse v. Godiva Chocolatier, Inc.*,
    463 F. Supp. 3d 453 (S.D.N.Y. 2020) ....................................................14

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...................................................... *passim*

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ...........................................................23

*Hon Hai Precision Indus. Co., Ltd. v. Molex, Inc.*,
    08-cv-5582, 2009 WL 310890 (N.D. Ill. Feb. 9, 2009).........................39

*Huhta v. Children's Hosp. of Phila.*,
    No. 93-cv-2765, 1994 WL 245454 (E.D. Pa. May 31, 1994).................15

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006)..............................................................................43, 45

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ...........................................................37, 40

*Inguran, LLC v. ABS Global, Inc.*,
    No. 20-cv-349, 2023 WL 5254780 (W.D. Wis. Aug. 14, 2023) ............28

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
    No. 15-cv-108-RGA, 2016 WL 264909 (D. Del. Jan. 21, 2016).............27

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................43, 45, 46

*Johnson v. Comm'n on Presidential Debates*,
    869 F.3d 976 (D.C. Cir. 2017) ........................................................................16

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ............................................................................45

*Kingray, Inc. v. Nat'l Basketball Ass'n, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ..........................................................31

*Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*,
    998 F. Supp. 2d 890 (C.D. Cal. 2014) ..............................................................4

*Lerma v. Univision Commc'ns, Inc.*,
    52 F. Supp. 2d 1011 (E.D. Wis. 1999) ...........................................................47

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ..........................................................................17

*Lupia v. Stella D'Oro Biscuit Co.*,
    586 F.2d 1163 (7th Cir. 1978) ........................................................................23

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ...........................................................................21

*McCauley v. City of Chi.*,
    671 F.3d 611 (7th Cir. 2011) ............................................................................8

*McGarry & McGarry, LLC v. Bankruptcy Mgmt. Sols., Inc.*,
    937 F.3d 1056 (7th Cir. 2019) ........................................................................28

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ........................................................................32

*Medline Indus., Inc. v. Diversey, Inc.*,
    563 F. Supp. 3d 894 (E.D. Wis. 2021) ...........................................................47

*Medrad, Inc. v. Sprite Dev. LLC*,
    No. 08-cv-5088, 2011 WL 3900730 (N.D. Ill. Sept. 6, 2011) .......................32

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ..........................................................................25

*Mercatus Group, LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ..........................................................................41

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
  859 F.3d 408 (7th Cir. 2017) ................................................25

*Miller v. Nicholas*,
  No. 20-cv-5230, 2021 WL 9037639 (E.D.N.Y. Nov. 3, 2021) ..............................41

*Mitsubishi Elec. Corp. v. IMS Tech., Inc.*,
  No. 96-cv-499, 1997 WL 630187 (N.D. Ill. Sept. 30, 1997) ..................................39

*Mullins v. Arco Petroleum Corp.*,
  502 F.2d 290 (7th Cir. 1974) ................................................36

*Murphy v. City of Chicago*,
  No. 01-cv-1802, 2001 WL 849744 (N.D. Ill. July 30, 2001) ..................................41

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ................................................31

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
  56 F.4th 1026 (5th Cir. 2023) ................................................10, 11

*NicSand, Inc. v. 3M Co.*,
  507 F.3d 442 (6th Cir. 2007) (en banc) ................................................13, 14, 32

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ................................................27

*Ohio v. Am. Express. Co.*,
  585 U.S. 529 (2018) ................................................37

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ................................................17, 22, 26

*Organ Recovery Sys., Inc. v. Pres. Sols., Inc.*,
  No. 11-cv-4041, 2012 WL 2577500 (N.D. Ill. July 4, 2012) ..................................39, 40

*Paddock Publ'ns, Inc. v. Chicago Trib. Co.*,
  103 F.3d 42 (7th Cir. 1996) ................................................25, 27, 42

*Paramount Media Grp., Inc. v. Vill. of Bellwood*,
  929 F.3d 914 (7th Cir. 2019) ................................................37

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) (per curiam) ................................................39

*PhantomALERT v. Apple, Inc.*,
  762 F. Supp. 3d 8 (D.D.C. 2025) ................................................12

*PNY Techs., Inc. v. SanDisk Corp.*,
    No. 11-cv-4689, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ...................................25, 26, 27

*Prentice v. Title Ins. Co. of Minn.*,
    500 N.W.2d 658 (Wis. 1993) ...............................................................................................47

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..................................................................................................10

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ................................................................................................44

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ................................................................................................23

*Riley v. Info. Sys. Audit & Control Ass'n, Inc.*,
    No. 22-cv-4465, 2023 WL 3997075 (N.D. Ill. June 14, 2023).............................................10

*Robinson v. HP, Inc.*,
    No. 24-cv-00164, 2025 WL 2802077 (N.D. Ill. Sept. 30, 2025)...........................................39

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) .....................................................................22, 25, 27, 30

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009).....................................................................................42

*Ryko Mfg. Co. v. Eden Servs.*,
    823 F.2d 1215 (8th Cir. 1987) ..............................................................................................26

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ................................................................................................10

*Sheridan v. Marathon Petroleum Co. LLC*,
    530 F.3d 590 (7th Cir. 2008) ..........................................................................................45, 46

*Shire US, Inc. v. Allergan, Inc.*,
    375 F. Supp. 3d 538 (D.N.J. 2019) .......................................................................................17

*Silverman v. Motorola, Inc.*,
    No. 07-cv-4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)........................................4, 12

*Siva v. Am. Bd. of Radiology*,
    38 F.4th 569 (7th Cir. 2022) ....................................................................11, 44, 45, 46

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).......................................................................................................9, 40

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)................................................................................29

*Stamatakis Indus., Inc. v. King*,
    965 F.2d 469 (7th Cir. 1992) ............................................................................28

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)....................................................................................22, 23

*Tanaka v. USC*,
    252 F.3d 1059 (9th Cir. 2001) ..........................................................................10

*Tangent Techs., LLC v. Recycled Plastics Indus., LLC*,
    No. 23-cv-261, 2024 WL 4007218 (E.D. Wis. July 24, 2024)................................45

*In re Tecfidera Antitrust Litig.*,
    791 F. Supp. 3d 852 (N.D. Ill. 2025) ................................................................23

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
    No. 99-cv-7654-HLH, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003) ....................25

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)........................................................................................37

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................................23

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948)....................................................................................43, 44

*United States v. Paramount Pictures, Inc.*,
    No. 19 MISC. 544 (AT), 2020 WL 4573069 (S.D.N.Y. Aug. 7, 2020) ...................43

*United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*,
    144 F.4th 976 (7th Cir. 2025) ..........................................................................36

*Valley Liquors v. Renfield Importers, Ltd.*,
    678 F.2d 742 (7th Cir. 1982) ............................................................................38

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)....................................................................................16, 36

*Wertymer v. Walmart, Inc.*,
    142 F.4th 491 (7th Cir. 2025) ..........................................................................12

*Will v. Comprehensive Acct. Corp.*,
    776 F.2d 665 (7th Cir. 1985) ............................................................................46

**Other Authorities**

Fed. R. Civ. P. 12(f)......................................................................................................42

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*
    *Principles and Their Application* (LexisNexis 2025)..................................................25, 26, 34

## INTRODUCTION

The antitrust laws exist to protect "competition, not competitors." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986). That fundamental principle dooms Newsmax's complaint. Newsmax is plainly unhappy that the news channel it launched in 2014 to offer "right-leaning news" is not attracting more viewers. But Newsmax's complaints about how it should be doing better do not show any injury to competition, and the antitrust laws do not give Newsmax an avenue to blame Fox News for its frustrations with its own performance.

Newsmax claims that Fox has stifled competition in a made-for-litigation "market" of "distribution of right-leaning pay TV news," Compl. ¶ 68—a market conveniently limited to three channels: Fox News, Newsmax, and OAN. Newsmax's entire theory is that Fox supposedly put terms in its contracts with distributors (*i.e.*, cable companies and Internet TV distributors like Hulu+Live TV) that either: (i) ban distributors from carrying Newsmax; or (ii) add costs for the distributors if they carry Newsmax in their most widely distributed package of channels—the "basic tier" of channels. At every turn, the Complaint fails to allege essential elements necessary to turn those bare assertions into an antitrust claim.

Start with the market definition. It is transparently deficient because it omits obvious economic substitutes for the three channels Newsmax identifies as the relevant market. The suggestion that channels like Fox News and Newsmax somehow compete in a self-contained "right-leaning news" market bubble—immune from competition from other cable news channels like CNN and all of Internet news—is implausible on its face. In fact, when Newsmax was required by law to disclose accurate information to investors, it told the SEC—in a filing that Newsmax cites *in the Complaint*, *see* Compl. ¶ 73 n.40—that its "primary competition comes from the cable networks FOX News, CNN, HLN, MSNBC and NewsNation." Newsmax Inc., Offering Circular (Form 1-A), at 46 (Mar. 7, 2025) (Ex. A). Newsmax's effort to define a market based

solely on the preferences of a subgroup of right-leaning consumers is also directly contrary to the Seventh Circuit's opinion earlier this year in *In re Harley-Davidson Aftermarket Parts Marketing, Sales Practices & Antitrust Litigation*, 151 F.4th 922, 934 (7th Cir. 2025), which rejected the plaintiff's alleged market for "American-made motorcycles" because it relied solely on the "idiosyncratic preferences" of some consumers and ignored other economic substitutes.  On top of that, the purported "right-leaning news" market would impose an unprecedented requirement on a court to define an economic market based on a subjective evaluation of the political viewpoint of speech.  Courts routinely reject efforts to gerrymander market definitions based on such subjective criteria.

Next, Newsmax fails to allege any facts plausibly suggesting that any agreements banning distributors from carrying Newsmax—*i.e.*, "exclusive carriage" agreements—actually exist. Newsmax never identifies even a single third-party distributor that carries Fox News but not Newsmax.  That is no accident:  Newsmax recently disclosed to investors and the SEC that it "has carriage agreements with *every* top pay TV operator in the U.S." and, as a result, is "in approximately 60 million U.S. households – *on par with other major news networks such as CNN and Fox News*."  Newsmax Inc., Current Report (Form 8-K), at Ex. 99.1 (May 8, 2025) (Ex. B) (emphasis added).

Newsmax fares no better with allegations about so-called "drag-down" provisions—a term of Newsmax's own invention.  Newsmax speculates that Fox supposedly adds costs for distributors who decide to carry Newsmax in their "basic tier" of channels by making that decision trigger a requirement to carry additional Fox channels in that tier.  Once again, Newsmax offers no well-pleaded factual allegations to suggest such provisions exist.  Instead, Newsmax's allegations

undermine the claim, because Newsmax alleges, at most, that *two* distributors do not carry Newsmax in their "basic tier." That cannot support an inference of broader restraint.

Newsmax's allegations of antitrust injury are equally deficient, because Newsmax fails to offer any factual allegations showing increased prices or reduced output. Its allegations about so-called "drag down" provisions, in particular, describe nothing more than discounting and bundled pricing for Fox channels, which does not undermine competition and raises no antitrust concern.

The bottom line is that Newsmax cannot show any unlawful competition foreclosing it from the market for distribution of its product. To the contrary, it has achieved distribution, again, in Newsmax's own words, "on par with … Fox News." And while Newsmax is obviously frustrated that achieving comparable distribution has not translated into comparable popularity, that does not give rise to an antitrust claim. As the Seventh Circuit has frequently instructed, "the antitrust laws are not balm for rivals' wounds. The antitrust laws are for the benefit of competition, not competitors." *Ball Mem'l Hosp.,* 784 F.2d at 1338. The Complaint alleges no injury to competition and should be dismissed with prejudice.

## BACKGROUND

### A.    Fox News and Newsmax

Newsmax alleges that "[f]or decades, Fox News has been the highest-rated cable news channel in the United States." Compl. ¶ 39. Fox "captures 65% of the total-day cable news audience and 66% in primetime" and, as of Q1 2025, "Fox News … marked 93 consecutive quarters as the most-watched cable news network in primetime." *Id.* ¶ 43. In fact, Newsmax alleges that in Q1 2025 "Fox News averaged 2.2 million total day viewers on weekdays, and averaged 1.9 million total viewers, double the viewership of ESPN." *Id.* ¶ 33. There is very high "subscriber demand" for Fox News because viewers want to watch it. *Id.* ¶ 41.

Newsmax launched Newsmax TV "as a pay TV channel in 2014." Compl. ¶ 44. Newsmax offers no allegations about demand or viewership numbers for its channel other than the vague assertion that "Newsmax ratings increased significantly" after the 2020 election. *Id.* ¶ 45.

Newsmax's parent first offered shares to the public earlier this year, and in its Offering Circular filed with the SEC—and cited in the Complaint (Compl. ¶ 73 n.40)—Newsmax told investors (and the SEC) that, when "compet[ing] for viewers," its "primary competition comes from the cable networks FOX News, CNN, HLN, MSNBC and NewsNation." Newsmax Inc., Offering Circular (Form 1-A), at 46 (Mar. 7, 2025) (Ex. A); *see also, e.g.*, Newsmax Inc., Annual Report (Form 10-K), at 12 (Mar. 31, 2025) (Ex. C).[1] Presumably, this statement in an SEC filing is a truthful and accurate description of the market in which Newsmax considers itself to compete.

**B.    Distribution of Pay TV Channels**

Newsmax alleges that, as one means for getting their channels to viewers, programmers like Fox and Newsmax sell their content to distributors that, in turn, deliver the programming to viewers. Compl. ¶ 23. Distributors for traditional paid TV are called Multi-Channel Video Programming Distributors ("MVPDs"). *Id.* These include cable and satellite providers like Comcast and DirecTV and providers like Verizon Fios. *Id.* Newsmax alleges that MVPDs package channels into bundles to sell to consumers. *Id.* Other distributors deliver bundled channels through streaming over the Internet, and are known as virtual MVPDs or "vMVPDs." *Id.* ¶ 24. These are services such as YouTube TV, Hulu+Live TV, Sling TV, and Fubo. *Id.* Although

---

[1] Newsmax's Offering Circular is available at tinyurl.com/NMAXOffCirc, and its Annual Report is available at tinyurl.com/NMAXAnnRpt. The Court may consider documents, like the Offering Circular, that are referenced in the complaint, *see Silverman v. Motorola, Inc.*, No. 07-cv-4507, 2008 WL 4360648, at *1 (N.D. Ill. Sept. 23, 2008), and it may take judicial notice of a party's SEC filings as matters of public record, *see Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 897 (C.D. Cal. 2014).

Newsmax does not mention it, Newsmax is also distributed directly to consumers (*i.e.*, without an intermediary distributor) through its app and its Internet streaming Newsmax+ and Newsmax2 products. *See* Newsmax Inc., Offering Circular (Form 1-A), at 54 (Mar. 7, 2025) (Ex. A).

MVPDs and vMVPDs enter carriage agreements with programmers that include pricing terms and carriage terms, pursuant to which distributors place the programmer's channel or channels into various "tiers," which are packages of channels offered at different price points. Compl. ¶ 25. A distributor's "basic" tier typically includes "essential and widely demanded channels" and is the cheapest. *Id.* Other tiers usually cost more and may include channels like HBO or "niche" (*i.e.*, less popular) programming. *Id.*

Newsmax claims that "intense demand" for Fox News—that is, consumers' desire to watch Fox News—gives Fox "leverage" in negotiating carriage agreements with distributors. *Id.* ¶ 32. Indeed, Newsmax says that most distributors consider Fox News a "must have" channel for their basic tier due to "subscriber demand." *Id.* ¶¶ 41, 88, 94, 105.

Newsmax acknowledges that, in recent years, tens of millions of Americans have switched away from relying on pay TV distributors for access to media content. Newsmax alleges that, over the past decade, "[i]n the streaming era, new distributors have emerged, including"—but not limited to—vMVPDS. *Id.* ¶ 24. As a result, traditional MVPD subscriber numbers have declined from "101 million subscribers over a decade ago to about 50 million U.S homes today," and that decrease has been offset by only 20 million subscribers switching to vMVPDs. *Id.* In other words, Newsmax alleges there has been a net switch of at least 30 million households to receiving media content—including news—from "new distributors" that are not pay TV distributors.

## C.     Newsmax's Alleged Market for "Distribution of Right-Leaning Pay TV News"

Directly contradicting what it says in its SEC filings, Newsmax alleges in the Complaint that it competes in a market limited to "distribution of right-leaning pay TV news"—a market that

conveniently consists of only three channels: Fox News, Newsmax, and OAN. Compl. ¶ 68. Newsmax does not explain what criteria define "right-leaning" news or who decides what speech offered by programmers is sufficiently "right-leaning" to warrant inclusion in this supposed market. Newsmax makes the conclusory assertion that "[r]ight-leaning audiences generally do not regard left-leaning news channels (*e.g.*, CNN, MSNBC) as substitutes." *Id.* ¶ 69.

As for Fox's alleged market power, Newsmax alleges that "Fox captures 65% of the total-day cable news audience and 66% in primetime"—figures that, Newsmax says, "understate its share within the right-leaning market because these percentages reflect all viewers." Compl. ¶ 72. Other than a conclusory assertion (unsupported by any facts) that Fox News has "about 90%" of the market, *id.* ¶ 40, Newsmax fails to provide any audience-share figures based on data within the supposed market for "right-leaning pay TV news."

Two points about the use of audience share numbers to allege "market share" in the market for "distribution of right-leaning pay TV news" bear noting at the outset. First, under Newsmax's allegations (and in the real world) distribution is not a zero-sum game. When a distributor purchases Fox News to distribute, it does not forego purchasing Newsmax. A distributor can purchase *both* and, as explained below (*see infra* p. 39), Newsmax says that distributors usually do. Second, as explained above, consumers purchase channels in bundles. As a result, when a consumer chooses to watch Fox News, that does not reflect a purchase of Fox News or a decision not to purchase Newsmax. The consumer will already have purchased distribution of *both* (as long as both are included in the distributor's bundle). Viewership numbers are important for measuring demand—and may affect the prices a programmer can charge to distributors and to advertisers—but they do not reflect economic transactions in any market.

### D.    Alleged Anti-Competitive Conduct

The Complaint alleges that, in its carriage agreements with distributors, Fox includes one

of two contract terms that Newsmax claims are anti-competitive.

First, Newsmax asserts that Fox "condition[s] carriage agreements on the distributor's agreement not to carry any right-leaning news channel, including Newsmax, that directly competes with Fox News."  Compl. ¶ 52.  There are no allegations explaining the factual basis for that assertion.  Newsmax does not allege that an agreement with any specific distributor contains (or used to contain) the alleged contract term, nor does Newsmax even allege that it is not carried now (or was not carried in the past) by any distributor as a result of such a term.  To the contrary, Newsmax's SEC filings state that Newsmax has carriage agreements with "*every top pay TV operator in the U.S.*" and that Newsmax is "in approximately 60 million U.S. households – on par with other major news networks such as CNN and Fox News."  Newsmax Inc., Current Report (Form 8-K), at Ex. 99.1 (May 8, 2025) (Ex. B) (emphasis added).[2]

Second, Newsmax alleges that Fox includes what Newsmax calls a "drag-down" provision in carriage agreements.  Compl. ¶ 54.  According to Newsmax, this term provides that "if a distributor carries Newsmax in its basic tier, then that distributor *must* include Fox's low-demand channels, such as Fox Business and Fox Sports 2, in that same basic tier."  *Id.*[3]  This alleged term supposedly creates a "financial penalty" for carrying Newsmax in the basic tier.  *Id.* ¶ 55.  With two possible exceptions, however, the Complaint contains no allegations indicating that Newsmax is *not* carried by distributors in their basic tier.  Those exceptions are Sling TV and Fubo: Newsmax alleges that, "[e]ven today, Newsmax is not included on either of Sling TV's two base

---

[2] This filing and its attached press release exhibit are available at tinyurl.com/NMAX-Form8K.

[3] Newsmax hedges its claim, acknowledging that the contract restrictions it is alleging may simply "block channels" from the basic tier based on "audience size," Compl. ¶ 52, which would amount merely to a parity provision ensuring that only channels reaching a threshold audience size would merit a slot in the basic tier.

plans." *Id.* ¶ 58.  As to Fubo, Newsmax says it is not carried in Fubo's "new Sports/News Package," *id.* ¶ 57, but does not say whether this package is a basic or premium tier.

Newsmax vaguely asserts that Fox's alleged contract terms generally "delayed" carriage of Newsmax.  Compl. ¶¶ 58, 61, 90.  But other than the bare assertion that Hulu+Live TV "express[ed] a strong desire" to carry Newsmax for "a decade" before it reached a deal with Newsmax, *id.* ¶ 58, the Complaint does not include any facts about any purported delay, much less include facts tying Fox to any such delay.  It does not plead any facts concerning when Newsmax sought carriage deals with different distributors, when carriage deals were concluded, or when Newsmax believes it satisfied the criteria that would have justified a carriage deal.

### E.    Newsmax's Antitrust Claims

Based on the allegations above, Newsmax asserts claims for unreasonable restraint of trade under Section 1 of the Sherman Act, *see* Compl. ¶¶ 83-90, unlawfully maintaining a monopoly under Section 2 of the Sherman Act, *id.* ¶¶ 91-98, unlawful "block booking" under Section 1 of the Sherman Act, *id.* ¶¶ 99-107, and parallel claims under the Wisconsin Antitrust Act.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Under this standard, the court accepts only "the well-pleaded facts in the complaint as true," not "legal conclusions" or "conclusory allegations merely reciting the elements of the claim."  *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681).  In applying this standard, the "reviewing court [must] draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (2007); *see 42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) ("In considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality." (citation omitted)).

**ARGUMENT**

The Sherman Act protects "*competition*, not *competitors*." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). It is directed "against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). And it does so not to protect rivals in the market, but out of concern for consumer welfare and the public interest. *Id.* Accordingly, a Sherman Act plaintiff must allege a relevant market and—in addition to either an agreement unlawfully restraining competition under Section 1 or a monopoly and unlawful efforts to maintain the monopoly under Section 2—injury to competition within that market. *Agnew v. NCAA*, 683 F.3d 328, 337-38 & n.4 (7th Cir. 2012). Such an injury requires factual allegations suggesting reduced output or raised prices for consumers. *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019).

As explained below, Newsmax fails to plead any of these elements. Newsmax's contrived market definition is deficient on its face. Newsmax fails plausibly to allege the existence of any agreements unreasonably restraining competition under Section 1 or the existence of a monopoly under Section 2. And Newsmax fails to allege injury to competition. The Complaint contains no factual allegations suggesting raised prices to consumers or reduced output. Instead, the only purported "harms" Newsmax identifies are complaints about "lost or delayed distribution, impaired brand exposure, and reduced advertising and carriage revenue" *for Newsmax*. Compl. ¶ 90. Those are injuries solely to Newsmax as a competitor, confirming that this case is about a disappointed competitor trying to use the antitrust laws offensively to extract rents from Fox News.

**I.      Newsmax's Claims All Fail Because It Has Not Plausibly Alleged a Relevant Market.**

Newsmax's claims all fail because Newsmax has not plausibly alleged the existence of a market limited to "distribution of right-leaning pay TV news." A plaintiff under the Sherman Act "fails to state a claim" where he "does not define a legally sufficient relevant market," as "required

by both sections 1 and 2 of the Sherman Act." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1035-37 (5th Cir. 2023); *see also Riley v. Info. Sys. Audit & Control Ass'n, Inc.*, No. 22-cv-4465, 2023 WL 3997075, at *2 (N.D. Ill. June 14, 2023) ("Sections 1 and 2 of the Sherman Act … require the plaintiff to plead a relevant product market …."). Properly defining a relevant market is a "threshold requirement for a valid antitrust claim," *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022), because "[i]t is the existence of a commercial market that implicates the Sherman Act in the first instance," *Agnew*, 683 F.3d at 337. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. USC*, 252 F.3d 1059, 1063 (9th Cir. 2001). A proper market definition includes both a product market and a geographic market. *See Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916-17 (7th Cir. 2020); *New Orleans*, 56 F.4th at 1035-37. Here, Newsmax fails to plausibly allege a legally cognizable product market.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Sharif Pharm.*, 950 F.3d at 918 (quoting *Brown Shoe*, 370 U.S. at 325). "Including economic substitutes ensures that the relevant product market 'encompasses the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (citation omitted). Where the proposed market "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997) (collecting cases). Courts thus routinely dismiss claims where a proposed market is too narrow because it omits obvious

-10-

economic substitutes. *See, e.g.*, *Hicks*, 897 F.3d at 1121-24; *New Orleans Cemeteries*, 56 F.4th at 103; *Colonial Med. Grp., Inc. v. Cath. Health Care W.*, 444 F. App'x 937, 938 (9th Cir. 2011).

Here, Newsmax's proposed market for "the distribution of right-leaning pay TV news," Compl. ¶ 68, is fatally deficient because that artificially narrow market—conveniently composed of only three programmers, "Fox, Newsmax and OAN," *id.*—fails to include obvious substitutes. Newsmax's definition artificially narrows the market in two ways: (i) by limiting it to distribution of "right-leaning news," thereby leaving out obvious economic substitutes in the form of other news channels; and (ii) by limiting it to "pay TV news," which leaves out other modes of delivering news, including even video news over the Internet. If the Court concludes that either constraint does not plausibly define a market, Newsmax's claims all fail.

### A.    Newsmax Fails to Allege a Plausible Market Limited to Distribution of "Right-Leaning News."

Newsmax's allegations are deficient on their face because Newsmax fails to allege any *facts* that plausibly support restricting the market to distribution of "right-leaning news." As the Seventh Circuit made clear just this year in *In re Harley-Davidson Aftermarket Parts Marketing, Sales Practices & Antitrust Litigation*, 151 F.4th 922, 934 (7th Cir. 2025), an economic market cannot be defined based on conclusory assertions about the preferences of a particular subgroup of consumers.[4] Yet Newsmax offers nothing more than the conclusory assertion that "[r]ight leaning audiences do not regard left-leaning news channels (*e.g.*, CNN, MSNBC) as substitutes." Compl. ¶ 30. "Saying so is not enough." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 578 (7th Cir. 2022). Newsmax "must instead plead facts making it plausible," *id.*, that "right-leaning" news distributed through MVPDs and vMVPDs constitutes a distinct product market. The complaint is devoid of any such factual

---

[4] Although the claim in *Harley-Davidson* was based on state antitrust law, the Seventh Circuit made clear its analysis reflected "the federal standard." 151 F.4th at 933.

allegations.  Newsmax baldly asserts that "[e]mpirical data indicates that right-leaning pay TV news viewers … do not treat general news channels … as adequate substitutes" and that "[r]ight-leaning viewers demonstrate minimal switching to non-right-leaning news outlets like CNN or MSNBC." Compl. ¶ 30.  But Newsmax nowhere provides this supposed "empirical data," nor does it allege any other facts to support its legal conclusion that viewers will not switch news networks—which simply restates the definition of a market.  *See, e.g.*, *Hicks*, 897 F.3d at 1122 (bare assertion that purchasers "will not switch" to other products "is a legal conclusion veiled as a factual allegation"); *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 21 (D.D.C. 2025) ("bare assertions that iPhone users are constrained from switching to [A]ndroid phones for access to apps" insufficient to support market definition) (quotation omitted).

Newsmax not only fails to support its conclusory assertions with factual allegations, but also flatly contradicts them—through both (1) the sources cited in the Complaint, and (2) Newsmax's own SEC filings.  Newsmax alleges that there is a distinct set of right-leaning news viewers who never switch to other news networks as substitutes and cites as support a PEW Survey.  *See* Compl. ¶ 31 nn. 4 & 5.  But the Court can and should take judicial notice that the PEW Survey Newsmax cites in the Complaint explicitly said *just the opposite*.[5]  That survey explained that, although the "*perception* is that because of their distinct identities … the cable news channels appeal to different,

---

[5] On a motion to dismiss, the Court "[i]s entitled to take notice of the full contents of the published articles referenced in the complaint."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007). "When the plaintiff, in the complaint, refers to a document that is critical to the claim, and does not deny its accuracy, the assertions contained in that document control over plaintiff's allegations to the contrary."  *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 498-99 (7th Cir. 2025) (examining web page cited in complaint to affirm dismissal); *see also Silverman*, 2008 WL 4360648, at *1 (on a motion to dismiss, "the court must consider any written instrument either attached to the complaint *or referred to therein*, and may take judicial notice of public disclosure documents filed with the SEC" (emphasis added)).

politically segmented audiences," the "*data show something different*." Ex. D (emphasis added).[6] The authors emphasized that "[o]ne of the most striking findings" in their study was "the degree to which viewers of one of the three cable news channels [Fox News, CNN, and MSNBC] also view the competition." *Id.* They found that "significant portions of Fox News and MSNBC audiences spend time watching both channels," that "[m]ore than one-quarter (28%) of the people who watch Fox News also tune in to MSNBC," and that "44% of Fox News viewers tune into CNN." *Id.*

The Complaint also repeatedly cites articles reporting ratings data from Nielsen to allege, for example, that Fox News "captures 65% of the total-day cable news audience." Compl. ¶¶ 43, 72; *see* Ex. E;[7] Ex. F.[8] But, as those articles show, Nielsen tracks data—and reporters covering the industry report on data—only for the overall "cable news" audience, not for any narrower category of "right-leaning" news. That matters because, where, as here, a plaintiff asserts the existence of a submarket, courts must consider the sufficiency of the allegations to show "industry or public recognition of the submarket as a separate economic entity." *Brown Shoe*, 370 U.S. at 325. Here, the Complaint shows the opposite. The data cited in the Complaint repeatedly confirms that no one in the industry recognizes—or tracks data for—a separate market for "right-leaning" news.

"When 'the complaint itself gives reasons' to doubt plaintiff's theory, … it is not [the court's] task to resuscitate the claim but to put it to rest." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007) (en banc) (quoting *Twombly*, 550 U.S. at 568). "Nothing prevents a plaintiff from

---

[6] Mark Jurkowitz & Amy Mitchell, *How Americans Get TV News at Home*, Pew Rsch. Ctr. (Oct. 11, 2013), https://www.pewresearch.org/journalism/2013/10/11/how-americans-get-tv-news-at-home.

[7] Mark Mwachiro, *Here's the 1st Quarter of 2025 Cable News Ratings*, AdWeek (Apr. 2, 2025), https://www.adweek.com/tvnewser/first-quarter-2025-cable-news-ratings/.

[8] Brian Flood, *Americans continue to choose Fox News Channel as network dominates May, tops ABC during weekday primetime*, Fox News (May 28, 2025, 6:06 PM), https://www.foxnews.com/media/americans-continue-choose-fox-news-channel-network-dominates-may-tops-abc-during-weekday-primetime.

pleading itself out of court," *id.*, and Newsmax has done so by repeatedly citing materials that flatly contradict its allegations about a market for "right-leaning" news.

Newsmax's SEC filings cited in the Complaint, *see* Compl. ¶ 73 n.40, also contradict Newsmax's conclusory allegations. When Newsmax was required by law to provide accurate information to investors and the SEC about competitors with whom Newsmax "competes for viewers," Newsmax reported that its "primary competition comes from the cable networks FOX News, CNN, HLN, MSNBC and NewsNation." Newsmax Inc., Offering Circular (Form 1-A), at 46 (Mar. 7, 2025) (Ex. A); *see also* Newsmax, Inc., Annual Report (Form 10-K), at 12 (Mar. 31, 2025) (Ex. C) (same). Newsmax did not tell the SEC that it was ensconced in an insulated, separate market solely for "right-leaning" news where its only competitors were Fox News and OAN. In fact, OAN did not appear in Newsmax's "primary competition" list. *Id.* And Newsmax's public website, which the Court may also consider on this motion,[9] confirms the same point. In an investor presentation, Newsmax identifies its "compeition [sic]" as CNN, CNBC, and MSNBC. Ex. G.[10]

Just as in *Harley-Davidson*, Newsmax's market definition is flawed because the alleged market is defined based on conclusory assertions about the preferences of a particular subgroup of consumers. In *Harley-Davidson*, plaintiffs alleged a separate market for "American-made motorcycles" premised entirely on allegations of "distinct customers" for whom foreign motorcycles would not be substitutes because "motorcycles serve as a means to celebrate their national heritage

---

[9] *See, e.g.*, *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 178-79 (S.D.N.Y. 2006) (consulting antitrust plaintiff's website for information that contradicted allegations in complaint and dismissing complaint); *see also Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) ("[F]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination …." (cleaned up)).

[10] Investor Presentation, Newsmax (Nov. 2025), https://ir.newsmax.com/overview/default.aspx (last visited Nov. 25, 2025).

and express their patriotism." 151 F.4th at 933-34. Affirming dismissal of the complaint, the Seventh Circuit held that "such a narrowly defined market is implausible." *Id.* at 933. Pointing to one of the criteria considered in defining submarkets, the court explained that the complaint failed to provide "support for industry or public recognition that American-made motorcycles are effectively a separate economic entity," and instead relied primarily on "idiosyncratic preferences" of some consumers. *Id.* at 934. Such preferences, however, do "not translate into the kind of economic power that antitrust law aims to mitigate." *Id.* (citation omitted) The same analysis forecloses Newsmax's effort to allege a "right-leaning Pay TV news" market. Newsmax similarly relies on conclusory assertions of idiosyncratic preferences of some consumers and fails to allege any facts suggesting "industry or public recognition" of a separate market for "right-leaning news"— whether or not that news is tied to MVPD or vMVPD distribution channels. To the contrary, the Complaint repeatedly cites Nielsen audience-share data for the overall cable news market and acknowledges that there is no data for "the right-leaning market," Compl. ¶ 43—because no one in the industry recognizes or tracks data for a market that was dreamt up solely for this lawsuit.

Putting all those errors to one side, Newsmax's market definition is also deficient because it purports to define a market based on a subjective evaluation of the political viewpoint of media content. Courts reject such attempts to "delineat[e]" a product market with "amorphous" criteria that are "too subjective to be defined in economic terms." *Carter Hawley Hale Stores, Inc. v. Limited, Inc.*, 587 F. Supp. 246, 252-53 (C.D. Cal. 1984) (rejecting market defined by consumers' "fashion orientation"); *see also Hendershot v. S. Glazer's Wine & Spirits of Okla., LLP*, No. 20-cv-0652, 2021 WL 3501523, at *11 (N.D. Okla. Aug. 9, 2021) (rejecting as "too vague" a "top 25 brands" market); *Huhta v. Children's Hosp. of Phila.*, No. 93-cv-2765, 1994 WL 245454, at *3 (E.D. Pa. May 31, 1994), *aff'd* 52 F.3d 315 (3d Cir. 1995) (rejecting a market for "seriously ill" patients as

"impossible to evaluate and too vague to be useful"). Defining a market based on whether speech is sufficiently "right-leaning" would be a wholly unprecedented and impossibly nebulous task.

Such a market definition would also raise First Amendment concerns given that the Court is being asked to enter injunctive relief and administer such relief going forward. *Cf. Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414-15 (2004) (cautioning against injunctive relief in situations where the court cannot "reasonably supervise" or be "an effective day-to-day enforcer" of the relief). What standard would the Court use to determine whether a news outlet was sufficiently "right-leaning" to be in this market? Newsmax does not say. Would the Court need to make a subjective value judgment about the viewpoints expressed on a network's programs? Should the Court look to the political-party affiliation of viewers? If a certain percentage of viewers are registered Democrats, does that mean the outlet is not sufficiently "right-leaning," or that Democrats are being persuaded by its content? All these questions underscore the implausibility of Newsmax's artificially narrow market. An economic market cannot be narrowed by asking courts to evaluate the ideological content of speech. For this reason, courts have already rebuffed attempts to define political and ideological markets, warning that markets in antitrust cases must concern traditional marketplaces, not "marketplace[s] of ideas." *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017) (rejecting an "electoral politics market" framed around "information"); *see also DataCell ehf. v. Visa, Inc.*, No. 14-cv-1658, 2015 WL 4624714, at *11 (E.D. Va. July 30, 2015) ("[A] restraint on 'ideas' in the amorphous 'media market' is not a restraint on trade under Section 1 of the Sherman Act.").

**B.    Newsmax Does Not Plausibly Allege a Market Limited to Distribution of "Pay TV news."**

Newsmax fares no better trying to limit the product market to distribution of "pay TV news" as distinct from other avenues for delivering news content to consumers. Where a supplier like

Newsmax claims it has been "shut-out" of part of a market, the relevant product market must include all avenues for suppliers to reach the ultimate consumer. *See, e.g.*, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("'The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals ....'" (quoting 2A Phillip E. Areeda *et al.*, *Antitrust Law* § 570b1 at 278 (1995))); *accord Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009); *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 473 (E.D.N.Y. 2005).[11] Even accepting Newsmax's conclusory assertion that "right-leaning pay TV news viewers remain firmly attached to ... *video media*," Compl. ¶ 30 (emphasis added), Newsmax does not address why alternative avenues for consumers to receive video news content are excluded from its purported market. Consumers can get video news from broadcast television as well as from direct-to-consumer Internet streaming services and websites. In fact, Newsmax itself has such a direct-to-consumer offering called Newsmax+. *See* Newsmax Inc., Offering Circular (Form 1-A), at 44, 54 (Mar. 7, 2025) (Ex. A).

Newsmax's approach suffers from the same defects as the overly narrow market definition the Ninth Circuit rejected in *Hicks*. There, professional golf caddies sued the PGA Tour for requiring them to wear bibs with advertisements on them, thereby preventing the caddies from selling bib-advertising independently. *Hicks,* 897 F.3d at 1114. The caddies alleged that they competed in a market for advertising in-between commercial breaks of professional golf tournaments, on the theory that viewers could not ignore "in-action" ads the way they could ignore other advertising. *Id.* at 1114-15. The Ninth Circuit held that "judicial experience and common sense" required rejecting the

---

[11] *See also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share."); *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 551 (D.N.J. 2019) ("[T]he relevant product market consists of all persons or entities to whom that supplier can reasonably sell[.]").

caddies' market because it "omit[ted] many economic substitutes," including "commercials during golf-related television programs, radio broadcasts, or podcasts," and even "golf-related websites or social media pages." *Id.* at 1121. On its face, the caddies' proposed market was "'not natural,' 'artificial,' and 'contorted to meet their litigation needs.'" *Id.* The same analysis describes Newsmax's contrived market definition here.

Once again, Newsmax's own SEC filing cited in the Complaint is inconsistent with its effort to plead a product market limited to "pay TV news." For example, Newsmax told the SEC that technology has provided "alternative methods for the delivery" of video content, undermining the traditional MVPD model, and that consumer preferences have "evolved toward lower cost alternatives, including direct-to-consumer offerings." Newsmax Inc., Offering Circular (Form 1-A), at 53 (Mar. 7, 2025) (Ex. A). Newsmax fails to provide any factual allegations explaining why such delivery alternatives—including its own direct-to-consumer offering—are not part of the market.

Indeed, Newsmax's SEC filings explain that Newsmax actually competes in an even broader market including other methods for delivering news in multiple formats. Newsmax explained that it competes with "free-to-air broadcast television networks," and that it "faces competition online from *Foxnews.com*, *CNN.com*, *Politico.com*, *WashingtonExaminer.com*, *NBCNews.com*, *NYTimes.com*, *CNBC.com*, *Bloomberg.com* and The Wall Street Journal Online, among others." Newsmax Inc., Offering Circular (Form 1-A), at 46 (Mar. 7, 2025) (Ex. A); *see also* Newsmax, Inc., Annual Report (Form 10-K), at 12 (Mar. 31, 2025) (Ex. C) (same). Again, no well-pleaded factual allegations plausibly exclude such alternatives from the relevant product market.

To the contrary, Newsmax's allegations further undermine its market definition. To exclude websites from the market for distributing right-leaning news, Newsmax asserts that people do not use websites for news—that is, "even the heaviest online news users spent only about four minutes

a day on that activity." Compl. ¶ 31. But that assertion comes from a twelve-year-old article from 2013. *Id.* n.4. Newsmax's own allegations make such outdated data wholly irrelevant. Newsmax alleges that, over the past ten years, more than 50 million households have switched from MVPDs to other sources for media content, and that since vMVPDs were first launched in 2014 (a year *after* the 2013 article) they have grown to 20 million subscribers and now control 30% of the pay TV market. Compl. ¶ 24. Those allegations describing such a wholesale restructuring of the market for distributing content make information about how the Internet and websites were used twelve years ago irrelevant for a plausible market definition. Beyond that, Newsmax alleges that, while traditional MVPDs have hemorrhaged 50 million subscribers over the last ten years, vMVPDs have picked up only 20 million subscribers, which means that at least 30 million households have switched to receiving media content by a substitute *other than* pay TV. *Id.* But Newsmax provides no plausible allegations to explain why the alternative platforms those 30 million households have switched to (including free TV over the Internet or direct streaming alternatives) are not economic substitutes for the distribution of news by pay TV.

## II.     Newsmax Fails to Plausibly Allege a Claim Under Section 1 of the Sherman Act.

To state a claim under Section 1 of the Sherman Act, a plaintiff must offer allegations of fact plausibly establishing that the defendant "(1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Ass'n of Am. Physicians & Surgeons v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 833 (7th Cir. 2021) (citation omitted). A complaint that fails plausibly to allege the existence and terms of a relevant agreement fails to satisfy the first element. *Id.* at 834-35. And one that pleads an injury to a competitor, rather than "an anticompetitive injury to the market," fails to allege antitrust injury. *Chi. Studio Rental*, 940 F.3d at 978.

Newsmax asserts Section 1 claims based on two alleged terms in Fox's carriage contracts: (1) an "exclusive carriage" term under which the distributor agrees "not to carry any right-leaning news channel" that competes with Fox News, Compl. ¶ 52; and, alternatively, (2) a supposed "drag-down" provision under which, if the "distributor carries Newsmax in its "basic tier" package, it must also include "Fox's low-demand channels, such as Fox Business and Fox Sports 2," in the same tier, *id.* ¶ 54.[12]  Newsmax's claims under either alleged contract term fail for multiple reasons.

## A.      Newsmax Fails to State a Claim Based on "Exclusive Carriage" Provisions.

Newsmax's claims based on alleged exclusive carriage provisions fail at the threshold because Newsmax has not alleged facts plausibly suggesting that Fox's carriage agreements even contain such provisions.  In addition, even if Newsmax had sufficiently alleged their existence, such terms are merely exclusive dealing arrangements and Newsmax fails to allege any foreclosure of competition or injury to competition as required to state a claim under Section 1.

### 1.      Newsmax Fails to Plausibly Allege that Exclusive Carriage Provisions Exist.

Newsmax makes the conclusory assertion that Fox "condition[s] carriage agreements on the distributor's agreement not to carry any right-leaning news channel … that directly competes with Fox News," Compl. ¶ 52, but it fails to provide any factual allegations that plausibly suggest the existence of such contract terms.  The only support Newsmax cites in the Complaint is a 2023 news article from *The Guardian*.  *Id.* ¶ 54 n.24; Ex. H.[13]  But that article says nothing at all about exclusive carriage terms, much less does it identify specific examples of such terms in Fox's

---

[12] Newsmax makes a passing assertion that Fox includes a "suite of other contractual barriers in[]" its carriage agreements intended to prevent Newsmax and others from competing," Compl. ¶ 3, but fails to provide any further allegations describing these purported terms, much less factual allegations plausibly establishing their existence.

[13] Katie Thornton, *How Fox Uses the World Cup and Masked Singer to Keep Fox News on Air*, GUARDIAN (Aug. 15, 2023, 10:52 AM), tinyurl.com/NewsmaxGuardianArticle.

contracts.  Nor does Newsmax claim to make any allegation based on direct knowledge or any other type of information concerning the terms of Fox's carriage agreements, which Newsmax acknowledges are "confidential."  *Id.* ¶ 53.  Newsmax does not even allege any examples of distributors who have refused to carry Newsmax—information that Newsmax would certainly know.  Although Newsmax vaguely asserts that it was "delayed" in securing carriage on four distributors (Fubo, Sling TV, Hulu+Live TV, and Mediacom), Newsmax attributes that delay to the alleged "drag-down" terms, not exclusive carriage terms.  *See id.* ¶¶ 57, 58, 61.  And Newsmax alleges that it *is* carried by each of those distributors.  *Id.*  Newsmax's own allegations thus negate the possibility that distributors are contractually bound not to carry it.  So do Newsmax's own SEC filings.  The Court can and should take notice of Newsmax's recent 8-K filing with the SEC in which it announced that "Newsmax now has carriage agreements with every top pay TV operator in the U.S."  Newsmax Inc., Current Report (Form 8-K), at Ex. 99.1 (May 8, 2025) (Ex. B).

Moreover, even if Newsmax had alleged facts showing that it was *not* carried by some distributors (now or in the past), that would still not plausibly allege the existence of "exclusive carriage" terms imposed by Fox.  Newsmax must provide "allegations plausibly suggesting (not merely consistent with)" the existence of the alleged contract terms, *Twombly*, 550 U.S. at 557, 564, and it is not sufficient to allege facts that "could just as easily reflect innocent conduct or rational self-interest."  *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022).  Here, the Complaint suggests equally, if not  more plausible, innocent explanations for decisions not to carry Newsmax.  Newsmax contends that Fox News is considered a "must-carry" channel due to "subscriber demand."  Compl. ¶ 41.  But Newsmax fails to offer any allegations about demand for its *own* channel beyond the anemic suggestion that its "ratings increased significantly" after the 2020 election.  *Id.* ¶ 45.  Newsmax offers no concrete metrics

plausibly suggesting that its channel is attractive to an audience and therefore to distributors. Instead, it makes the conclusory leap that any decision *not* to carry Newsmax must have been driven by an exogenous factor—namely, a phantom contract provision in Fox's agreements with distributors.  In short, the facts alleged in the Complaint are entirely consistent with the inference that decisions not to carry Newsmax were products of "rational and competitive business strateg[ies] unilaterally prompted by common perceptions of the market," *Twombly*, 550 U.S. at 554—the common perception among distributors that, compared to Fox News, Newsmax was simply not as useful for attracting viewers.

> **2.    Even If "Exclusive Carriage" Provisions Were Adequately Alleged, Newsmax's Allegations Describe Nothing More than Exclusive Dealing Arrangements that Do Not Violate Section 1.**

Even if Newsmax had adequately alleged the existence of exclusive carriage provisions, the allegations still would not state a claim under Section 1.  Such terms amount to a permissible form of exclusive dealing arrangement.  Because there are "well-recognized economic benefits to exclusive dealing arrangements," they are evaluated under the rule of reason.  *Omega Env't*, 127 F.3d at 1162.  Stating a claim based on such an agreement requires, at a minimum, plausibly alleging (i) that the contract "will foreclose competition in a substantial share of the line of commerce affected," and (ii) injury to competition.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *accord Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) ("The exclusion of competitors is cause for antitrust concern only if it impairs the health of the competitive process itself.").  Newsmax fails on both fronts.

> **a.    Newsmax fails to plead facts plausibly suggesting substantial foreclosure of competition.**

Newsmax's claim fails on the first element because Newsmax has failed to allege any facts suggesting that the alleged exclusive carriage terms have substantially foreclosed competition.

*See, e.g.*, *In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 867 (N.D. Ill. 2025) (dismissing exclusive dealing claims for failure to "adequately [plead] substantial foreclosure"). An exclusive-dealing arrangement presents antitrust concerns only when "the competition foreclosed by the contract … constitute[s] a substantial share of the relevant market." *Tampa Elec.*, 365 U.S. at 328; *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004). Accordingly, to state a claim, a plaintiff must offer facts about "the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area." *Tampa Elec.*, 365 U.S. at 329; *cf. Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1173 (7th Cir. 1978) (claim fails where the "plaintiff was totally unaware of the share of the relevant market foreclosed by the exclusive dealing agreement"). Although there are no hard and fast numerical limits, courts routinely hold that foreclosure of "roughly 40% or 50%" of the market is "usually required in order to establish a § 1 violation." *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001). Newsmax comes nowhere close to meeting these standards.

*First,* Newsmax fails to plead facts suggesting that *any* portion of the market is foreclosed. As noted above, *see supra* Part II.A, Newsmax does not allege that any specific distributor is bound by an exclusive carriage agreement,[14] nor does Newsmax even identify a single distributor (other than Fox-owned Tubi, *see* note 19) that does not carry Newsmax. Newsmax also fails to allege how many distributors are in the market or—more importantly for assessing market foreclosure— how many subscribers each distributor reaches. *See, e.g.*, *Hip Hop Beverage Corp. v. Monster*

---

[14] In one paragraph, Newsmax describes *both* the exclusive carriage contract term and the so-called "drag-down" term and alleges that "Fox has entered into such agreements with distributors including Fubo, Sling TV/DISH, Hulu+, and Mediacom." Compl. ¶ 85. Elsewhere in the Complaint, however, Newsmax makes clear that it believes that those four vMVPDs have had the drag-down term in their contracts, not exclusivity terms. *See id.* ¶¶ 57, 58, 61. Moreover, Newsmax also affirmatively alleges that it is carried by each of those vMVPDs, which would be inconsistent with their having exclusive carriage agreements with Fox. *See id.* ¶ 6.

*Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (affirming dismissal because plaintiff "did not allege how many total brokers were in the market in order to establish that [defendant] foreclosed competition"). Even if Newsmax had alleged that certain distributors refused to carry it, the facts in the Complaint do not give the vaguest idea what share of the market those distributors covered.

What *can* be gleaned from the Complaint is that Newsmax is carried by numerous distributors, including at least DirecTV, DISH, Hulu+Live TV, YouTube TV, Fubo, Sling TV, and Mediacom. Compl. ¶¶ 6, 57, 58, 61. Beyond that, Newsmax's SEC filings refute any claim of market foreclosure. Newsmax has told investors and the SEC that it "has carriage agreements with *every* top pay TV operator in the U.S." and that it is "in approximately 60 million U.S. households – *on par with other major news networks such as* CNN and *Fox News*." Newsmax Inc., Current Report (Form 8-K), at Ex. 99.1 (May 8, 2025) (Ex. B) (emphases added). Where Newsmax has distribution to households "on par with … Fox News," it cannot plausibly claim that Fox has substantially foreclosed it from the distribution market.

Newsmax repeatedly points to Fox News's 65% share of *viewers* in cable news, *see, e.g.*, Compl. ¶¶ 43, 72, 88, but such audience-share numbers are irrelevant to market foreclosure. Newsmax has alleged a market for the "*distribution* of right-leaning pay TV news." Compl. ¶ 68 (emphasis added). Given that Newsmax has secured a distribution contract with every major distributor, its comparatively lower audience numbers show only that it is losing the competition for viewers in a competitive market, not that it has been foreclosed from securing distribution of its channel. The antitrust laws do not guarantee Newsmax equal popularity; they protect competition, not a news organization disappointed by its own viewer ratings.

*Second*, even if Newsmax had alleged it was not carried on one or more distributors due to Fox's contracts, that still would not allege substantial foreclosure of competition, because

Newsmax pleads no facts whatsoever about the duration or terminability of those contracts. "Short contract terms and low switching costs generally allay most fears of injury to competition" from exclusive arrangements. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1802g1 (LexisNexis 2025); *see also id.* ¶ 1802g2. "Exclusive contracts make the market hard to enter" only during the term of the contracts, but if the term is short—or the contracts are easily terminated—they "cannot stifle competition over the longer run." *Paddock Publ'ns, Inc. v. Chicago Trib. Co.*, 103 F.3d 42, 45-47 (7th Cir. 1996); *see also Roland*, 749 F.2d at 395 (similar). When such contracts terminate, rivals can compete for new contracts, including exclusive contracts. *Paddock*, 103 F.3d at 45; *accord Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004).

According to the Guardian article the Complaint cites repeatedly, *see* Compl. ¶¶ 47 n.20, 48 n.23, 52 n.24, carriage agreements are negotiated "[e]very three years." Ex. H. That places such agreements squarely in the realm of contracts that are sufficiently short that they presumptively do not raise concerns for foreclosing competition. *See, e.g.*, *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) (competition not foreclosed by exclusive contract that "expired every two or three years"); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. 99-cv-7654-HLH, 2003 WL 21397701, at *2 (C.D. Cal. Mar. 7, 2003) (approving exclusivity contracts that were "usually between three and ten years, and average six years"), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-4689, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) ("Courts in this circuit have found [exclusive-dealing] contracts with terms ranging up to three, and even five, years to be acceptable.").

*Third*, even if Newsmax had identified distributors that refused to carry Newsmax (which it has not), being foreclosed from a particular distribution channel is not equivalent to being

foreclosed from competition in the relevant market. For purposes of assessing foreclosure of competition, it is access to the ultimate consumer that matters. That is why "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Omega Env't.*, 127 F.3d at 1162; *accord Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1235-36 (8th Cir. 1987). "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market." *Omega Env't.*, 127 F.3d at 1163 (emphasis original). Simply put, if Newsmax can reach the right-leaning-video-news-consuming public by means other than through pay TV distributors, competition cannot be foreclosed. *See* Areeda & Hovenkamp ¶ 1802f (assessing foreclosure requires including "the full range of selling opportunities reasonably open to rivals").

Here, Newsmax has many alternative avenues to reach news consumers. As Newsmax itself has acknowledged, "[c]hanges in consumer behavior and technology" are driving changes in news distribution. Newsmax Inc., Offering Circular (Form 1-A), at 10 (Mar. 7, 2025) (Ex. A). "[T]raditional MVPDs" are on the wane, and "[c]onsumers are increasingly turning to alternative offerings, including Subscription Video on Demand ('SVOD') and Advertising Video on Demand ('AVOD') services and mobile and social media platforms," and also to direct-to-consumer offerings, like Newsmax's app, as well as its ad-supported and subscription streaming channels, Newsmax2 and Newsmax+. Newsmax Inc., Annual Report (Form 10-K), at 16 (Mar. 31, 2025) (Ex. C); *see id.* at 18; Newsmax Inc., Offering Circular (Form 1-A), at 10 (Mar. 7, 2025) (Ex. A) (same). Indeed, the Complaint acknowledges that, over the last decade, at least 30 million U.S. households have switched away from MVPDs and vMVPDs to get their media from other sources. Compl. ¶ 24. Given these alternative avenues of distribution, even if Newsmax had alleged that

some distributors did not carry Newsmax, that could not plausibly raise an inference of substantial foreclosure of competition. *See PNY Techs.*, 2014 WL 2987322, at *8-9 (plaintiff "failed to plead the lack of alternative channels of distribution because its allegations that the direct sales channel was insufficient … were nothing but bare assertions" (cleaned up)); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, No. 15-cv-108-RGA, 2016 WL 264909, at *5-7 (D. Del. Jan. 21, 2016) (similar).

*Fourth*, Newsmax cannot salvage its claim by arguing that exclusive carriage agreements *in the past* delayed its growth. *See, e.g.*, Compl. ¶¶ 4, 58, 61, 86, 90 (conclusory assertions of "delay"). Vague claims of delay are not the same as foreclosure of competition, because delay may be the permissible side effect of perfectly lawful exclusive contracts. *See, e.g.*, *Roland*, 749 F.2d at 395 ("[A] collateral effect of exclusive dealing is to slow the pace at which new brands … are introduced."); *Paddock*, 103 F.3d at 44 (rejecting claim that dominant newspaper's exclusive dealing with news services made it "harder for small papers to grow"). More important, Newsmax's Complaint is equally devoid of any concrete factual allegations to support such a theory. With the exception of a conclusory allusion to Hulu+Live TV wanting to carry Newsmax for "a decade," Compl. ¶ 58, Newsmax has not alleged that any particular distributor refused to carry Newsmax in the past or for how long or when Newsmax sought to contract with a distributor, when the distributor said "no," or when it eventually said "yes." Vaguely invoking "delay" is no solution for the glaring holes in the factual allegations in Newsmax's Complaint.

### b. Newsmax has failed to plead injury to competition.

Newsmax's claims also fail because Newsmax has failed to plead any facts plausibly suggesting an injury to competition. Because the "[a]ntitrust laws protect competition and not competitors," *42nd Parallel*, 286 F.3d at 405, to state a claim under the Sherman Act a plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see also Agnew*,

683 F.3d at 335 ("[T]he plaintiff must allege, not only an injury to himself, but an injury to the market as well.") (quotation omitted). This injury must be "to the relevant market" and "must either reduce output or raise prices to consumers." *Chi. Studio Rental*, 940 F.3d at 978; *see also McGarry & McGarry, LLC v. Bankruptcy Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019) ("[I]njury must flow directly 'from higher prices or lower output, the principal vices proscribed by the antitrust laws.'" (citation omitted)); *accord Inguran, LLC v. ABS Global, Inc.*, No. 20-cv-349, 2023 WL 5254780, at *7 (W.D. Wis. Aug. 14, 2023) (Conley, J.). Here, Newsmax has pled, at best, injury to itself, not anticompetitive injury to the market.

To the extent Newsmax claims that Fox's actions have injured it through "raised … costs" or "lost or delayed distribution, impaired brand exposure, and reduced advertising and carriage revenue," Compl. ¶ 90, those are all injuries solely to Newsmax as a competitor, not injuries to the market. "[A] producer's loss"—including "a decline in sales"—"is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992); *see also Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996) ("Over and over, we stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business.").

Similarly unavailing are bare assertions that Fox's actions have "reduced competition," Compl. ¶ 90, and "harmed … competition itself," *id.* ¶ 80. "[T]o plead injury to competition … sufficiently to withstand a motion to dismiss, 'a [Section 1] claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198, 1202 (9th Cir. 2012) (citation omitted).

Newsmax fares no better with repeated assertions that Fox's actions have "increase[ed]

prices for consumers," Compl. ¶ 46, or "increased the cost consumers must bear to access right-leaning news," *id.* ¶ 90; *see also id.* ¶¶ 19, 51, 62, 71 (similar). "[A] conclusory allegation that prices have increased" does not suffice to allege an injury to competition, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018), and "[r]epetition cannot substitute for factual allegations," *Am. Physicians & Surgeons*, 15 F.4th at 834. Newsmax does not offer any factual allegations about price increases for consumers. Newsmax "cite[s] no examples, data, or other facts to support [its] assertion" of increased prices—just naked conclusions masquerading as factual allegations. *Spinelli*, 903 F.3d at 212 (dismissing Section 1 claim where plaintiff offered the conclusory allegation that "the aggregate cost to consumers [of commercial licenses] has increased"); *see also, e.g.*, *Chi. Studio Rental*, 940 F.3d at 979 (complaint insufficient where it "does not allege what … costs increased, how much they increased by, and who experienced the increased costs"); *Contractor Tool Supply, Inc. v. JPW Indus., Inc.*, 785 F. Supp. 3d 1107, 1117 (M.D. Fla. 2025) ("bald statement[s] of harm to competition" with "no examples of higher prices" insufficient to allege injury) (quotation omitted).[15]

The closest Newsmax comes to pleading any facts related to prices are its assertions about the prices *distributors* pay to carry Fox News, not the prices for *consumers*. Even on that score, all Newsmax alleges is that, due to high "subscriber demand," Compl. ¶ 41, Fox News can charge distributors a higher fee than other cable news channels, *see id.* ¶ 42, and that two years ago Fox had a "plan" to increase its fee ("to $3 per subscriber," *id.*).[16] The allegation about a "plan" to increase fees is, by its nature, wholly speculative. *See Bootler, LLC v. Google, LLC*, No. 24-cv-

---

[15] The bald assertion that Fox "has degraded the quality of right-leaning pay TV news," Compl. ¶ 80, is also insufficient. It is contradicted by allegations about the continued "intense demand" for Fox News, *id.* ¶ 32, and is also unsupported by any factual allegations whatsoever.

[16] Newsmax currently charges $4.99 per month for its direct-to-consumer offering.

3660, 2025 WL 2576710, at *7 (N.D. Ill. Sept. 4, 2025) ("assertions of potential future conduct are speculative, 'conclusory statements,' [that] do not suffice" to allege injury).  And Newsmax does not allege that the increase took place.  Apart from that, the Complaint alleges no facts about increased fees to distributors.   And even if there had been an increase, there is nothing anticompetitive about increased prices for a product that enjoys higher "subscriber demand," Compl. ¶ 41, than its rivals; that is basic economics.  Newsmax itself has reported in its filings to the SEC that it has increased revenues in part due to "rate increases that went into effect in 2025,"[17] and Newsmax does not claim there was anything anticompetitive about that.

Beyond failing to allege actual increased fees to distributors, the Complaint also fails to identify any facts plausibly suggesting that such increases (if they existed) would be passed on to consumers.  Even if "intense demand," Compl. ¶ 32, increased distributors' costs for Fox News, costs for other content with weaker demand may be decreasing.  And the market for distributors to secure subscribers may be sufficiently competitive that distributors cannot pass along every fluctuation in price.  Newsmax fails to allege any facts regarding any of those market conditions that would be necessary for any increase in consumer prices to be plausible, much less for it to be plausible that any increases would reflect *supracompetitive* prices, as would be necessary to allege injury to competition.  *Roland*, 749 F.2d at 394 (plaintiff must establish defendant's conduct "raise[d] prices above … the competitive level"); *see Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("[T]he occurrence of a price increase does not in itself permit a rational inference of … supracompetitive pricing.").

---

[17] Newsmax, Inc., Current Report (Form 8-K), at Ex. 99.1 (Aug. 19, 2025) (Ex. I).  This filing is available at tinyurl.com/NMAX-8K-2.  It is subject to judicial notice.  *See supra* note 1.

Newsmax's allegations about reduced output are equally deficient.  Apart from conclusory assertions about "reduced output," Compl. ¶ 19, and "reduce[d] consumer choice," *id.* ¶ 62,[18] Newsmax makes, at most, two specific claims: (i) that "in the past," Fox "reduce[d] output" by "successfully prevent[ing] Sling TV from adding Newsmax … which left Sling TV's viewers without any choice in the relevant market other than Fox News," *id.* ¶ 70, and (ii) the vague assertion that "restrictive tiering agreements dictated by Fox" delayed Hulu+ from carrying Newsmax for "a decade," *id.* ¶ 58.  But such assertions about "delayed" carriage on two distributors do not allege any reduced output in the market overall, especially where the market includes at least eight other distributors, *see id.* ¶¶ 23-24 (citing Comcast, Spectrum, DirecTV, DISH, Verizon Fios, YouTube TV, DirecTV Stream, and Fubo), that apparently carried Newsmax. Lack of carriage on Sling TV and Hulu+ did not reduce output; it simply meant that consumers would have to use other distributors to watch Newsmax.  As the Seventh Circuit explained in addressing the antitrust implications of restrictions on broadcasting professional basketball games, "[i]f the league arranges for the broadcast of every game" so that it is carried on some outlet, even if other outlets are blocked, "there is no reduction in output."  *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992); *accord Kingray, Inc. v. Nat'l Basketball Ass'n, Inc.*, 188 F. Supp. 2d 1177, 1194 (S.D. Cal. 2002) ("[T]he NBA League Pass's black-out provision does not restrict output; it only affects what channel the game is available on."); *see also NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) (analyzing output in market for

---

[18] "Reduced choice" is not the same as "reduced output," and mere "reduced choice" is not an antitrust injury.  *Brantley*, 675 F.3d at 1202 (allegations that an agreement "reduc[es] consumers' choices" are "not sufficient[]" to allege "an injury to competition").  If a market goes from 15 sellers to 14, there may be "reduced choice," but not an antitrust injury as long as the remaining 14 sellers can supply the same quantity of goods.  Here, however, Newsmax's allegations are all sufficiently superficial that the Court need not make any distinction to dismiss Newsmax's claims.

televised NCAA games in terms of "the quantity of television rights available for sale"). So too here. Newsmax's allegations show that right-leaning news programming, including Newsmax, remains broadly available to consumers across multiple distributors. There is no reduction in output, only competition for audience share.

In more simplified terms, it is settled that "a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market." *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980). And "[w]ithout any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted." *Medrad, Inc. v. Sprite Dev. LLC*, No. 08-cv-5088, 2011 WL 3900730, at *3 (N.D. Ill. Sept. 6, 2011) (citation omitted). Once again, Newsmax's allegations about purported "reduced output" boil down solely to an injury to Newsmax. And where the "claimant is doing nothing more than invoking the antitrust laws to protect a competitor, not competition," the Sherman Act claim fails. *NicSand*, 507 F.3d at 457 (en banc).[19]

## B. Newsmax's Allegations Concerning So-Called "Drag-Down" Provisions Fail To State A Claim.

### 1. Newsmax Fails to Allege that "Drag-Down" Provisions Even Exist.

Newsmax fares no better alleging the existence of so-called "drag down" provisions. Newsmax does not purport to have direct knowledge of any such terms, nor does Newsmax allege facts that plausibly suggest those terms exist. With only two possible exceptions, Newsmax does

---

[19] The allegation that Fox refused to carry Newsmax on "Fox-owned Tubi," Compl. ¶ 81, cannot support a Section 1 claim because a parent and its wholly owned subsidiary are a "single enterprise," so the two necessarily cannot conspire. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984). Any refusal by Tubi to carry Newsmax is a unilateral refusal to deal, which is unlawful in only two outlier sets of circumstances that are not present (and not alleged) here. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610 (1985); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (essential facility doctrine).

not even allege that any distributors fail to carry Newsmax in their basic tier. Newsmax alleges that it "is not included on either of Sling TV's two base plans." Compl. ¶ 58. And with respect to Fubo, Newsmax alleges that it is not carried in Fubo's "new Sports/News Package," *id.* ¶ 57, but does not allege that package is, in fact, a basic tier offering. Even counting both Sling and Fubo as not carrying Newsmax in their basic tier, such a decision by only two carriers provides no plausible basis for inferring the existence of the contract clause Newsmax alleges.

To the extent Newsmax asserts that Fox's alleged contract terms "delayed" distributors' decisions to carry Newsmax, Compl. ¶¶ 58, 61, Newsmax fails to provide even rudimentary facts evidencing such a delay, much less a delay attributable to Fox. Beyond a single mention of Hulu+, the Complaint contains no allegations concerning when Newsmax sought carriage deals or when deals were concluded.[20] Instead, it relies on vague assertions like the claim that DISH "[p]reviously" expressed interest in carrying Newsmax on Sling TV, *id.* ¶ 58, and the wholly unsupported claim that carriage on Mediacom was "delayed," *id.* ¶ 61.

Crucially, moreover, the Complaint contains no factual allegations at all concerning when Newsmax believes it satisfied the criteria that (even in Newsmax's view) would justify carriage on the sought-after "basic tier." Newsmax says that tier is reserved for "essential and widely demanded channels." Compl. ¶ 25. But Newsmax offers no facts to suggest when it achieved sufficient ratings (or any other measure of demand) to qualify as "essential" or "widely demanded" such that a distributor's failure to carry Newsmax in its basic tier could suggest anything other than a rational competitive decision based on weak or non-existent demand for a new entrant's start-up channel. Contrary to Newsmax's approach, it is not consistent with pleading under

---

[20] Newsmax alleges that it concluded a carriage deal with Hulu+ in July 2025, "after a decade of Hulu+ expressing a strong desire to carry Newsmax." Compl. ¶ 58.

*Twombly* for a new entrant to vaguely assert "delayed growth" and then leap to inventing contract terms supposedly imposed by a rival as the cause.

> **2.      So-Called "Drag Down" Provisions Fail to State a Claim in Any Event.**

Even if Newsmax had adequately alleged their existence, its allegations regarding the supposed "drag-down" provisions fail to state a claim.   Newsmax alleges that, under these provisions, if a distributor carries Newsmax in its "basic tier," it must also include Fox's "low-demand channels, such as Fox Business and Fox Sports 2," in the same tier.   Compl. ¶ 54. Newsmax claims such terms "create a direct financial penalty for any distributor who wishes to carry Newsmax in its basic tier." *Id.* ¶ 55.   On its face, this alleged arrangement is *less* restrictive than the exclusive dealing terms addressed above, which allegedly prohibit distributors from carrying Newsmax *at all*.   Because the exclusive carriage allegations fail to state a claim, it necessarily follows that the less restrictive "drag-down" provisions also fail to qualify as an unreasonable restraint on trade under Section 1.

Rule of reason analysis bears that out.   In the light most favorable to Newsmax, the Complaint alleges a type of "exclusive" or "conditioned" discounting.   If a distributor keeps Newsmax out of its basic tier (reflecting a desire to limit the number of channels in that tier), the distributor can obtain a "discounted" price for inclusion of only Fox News in that basic tier.   If the distributor puts Newsmax in the basic tier, however, the price allegedly goes up, because the distributor must pay a higher price for a package that includes Fox News, Fox Business, and Fox Sports 2.   *Cf.* Compl. ¶ 55 (alleging that "if a distributor" places Newsmax "into the basic tier," it "would be subject to … additional license fees").   Such "[d]iscounts conditioned on exclusivity in relatively short-term contracts are rarely problematic."   Areeda & Hovenkamp, ¶ 1807b1.   And courts consider three-year carriage contracts to be relatively short term.   *See supra* p. 26.   Contracts

providing for such discounts do not raise anticompetitive concerns because a "competing [seller] need[] only offer a better product or a better deal to acquire" business. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010). And Newsmax cannot claim that the "drag-down" provisions have the practical effect of precluding distributors from carrying Newsmax in the basic tier, because Newsmax fails to allege facts showing it has been shut out of the basic tier. With the exception of Sling TV, *see* Compl. ¶ 58, and perhaps Fubo, *see supra* p. 33, Newsmax fails to allege that it is not carried by *any* distributor in its basic tier.

In any event, even if the drag-down allegations were analyzed as exclusive dealing, they would still fail to state a claim under largely the same analysis outlined above.

*First*, for all the same reasons, Newsmax has failed to allege substantial foreclosure of competition. *See supra* Part II.A.2.a. Newsmax fails to identify a single distributor that does not carry Newsmax, *see* Compl. ¶¶ 6, 57-58, 61, and at most two who allegedly do not carry Newsmax in their "basic" tier, *id.* ¶ 58. Even as to those two, Newsmax fails to allege how many subscribers are reached on their basic tiers, how many subscribers Newsmax currently reaches in the tier where it is carried, and how any of those numbers compare to the size of the market overall. On top of that, of course, Newsmax's recent SEC filing—made to inform potential investors—states that it has distribution "on par with other major news networks such as CNN and Fox News." Newsmax Inc., Current Report (Form 8-K), at Ex. 99.1 (May 8, 2025) (Ex. B) (emphasis added). That is fatal to any claim of market foreclosure: a company that tells investors its distribution is on a par with Fox News's cannot plausibly allege that Fox has shut it out of the market.

*Second*, Newsmax's claim also fails because Newsmax has not alleged any cognizable injury to competition. Newsmax does not offer separate allegations about injury to competition based on the drag-down provisions. Instead, it relies on the same conclusory, fact-free assertions

addressed above about "reduce[d] output," Compl. ¶ 70, and "increase[s] [in] the cost consumers must bear to access right-leaning news," *id.* ¶ 90. For all the same reasons, *supra* Part II.A.2.b, those allegations fail to plausibly allege an injury to competition.

### III. Newsmax Fails to State a Claim for Maintenance of Monopoly Power Under Section 2 of the Sherman Act.

Newsmax also fails to state a claim that Fox has violated Section 2 by unlawfully maintaining monopoly power in a relevant market. Compl. ¶¶ 91-98. "A monopolization claim has two elements: (1) 'the possession of monopoly power in the relevant market' and (2) 'the willful acquisition or maintenance of that power through exclusionary conduct.'" *United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025) (citation omitted). "The mere possession of monopoly power … is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407. Accordingly, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.* Here, Newsmax has failed plausibly to allege either that Fox has monopoly power or that it has willfully maintained such power by anticompetitive means.

### A. Newsmax Fails Adequately to Allege that Fox News Has Monopoly Power in a Relevant Market.

Newsmax's allegations of market power fail for at least two reasons.

*First*, Newsmax's market definition is fatally defective. *See supra* Part I. For that reason alone, the Section 2 claim fails. *See Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 480 (7th Cir. 1988) ("It is impossible to monopolize a market that does not exist."); *Mullins v. Arco Petroleum Corp.*, 502 F.2d 290, 295 n.14 (7th Cir. 1974) ("A definition of the relevant market is an essential element of a violation under Section 2 of the Sherman Act."); *accord Goodloe v. Nat'l Wholesale Co., Inc.*, No. 03-cv-7176, 2004 WL 1631728, at *5 (N.D. Ill. July 19, 2004).

*Second*, even if Newsmax had properly alleged a market, it has failed to allege facts suggesting that Fox has monopoly power in that market.  Monopoly power is "the power to control prices or exclude competition," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956), a definition that has been "alternatively stated in this circuit as 'power over price' or 'the ability to cut back the market's total output and so raise price," *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (quoting *Ball Mem. Hosp.*, 784 F.2d at 1335).  A plaintiff can establish the defendant's monopoly power either by (1) providing "direct evidence of anticompetitive effects" or (2) "proving relevant product and geographic markets and showing that the defendant's share exceeds whatever threshold is important for that practice in the case." *Paramount Media Grp., Inc. v. Vill. of Bellwood*, 929 F.3d 914, 922 (7th Cir. 2019) (citation omitted); *see Ducere LLC v. Enbridge (U.S.) Inc.*, No. 24-cv-01217, 2025 WL 81373, *4 (N.D. Ill. Jan. 13, 2025).  Newsmax has failed to allege monopoly power under either method.

Under the direct method, "the plaintiff must allege 'proof of actual detrimental effects on competition … such as reduced output, increased prices, or decreased quality." *Ducere*, 2025 WL 81373 at *4 (quoting *Ohio v. Am. Express. Co.*, 585 U.S. 529, 542 (2018)).  As explained above, *supra* Part II.A.2.b, Newsmax has failed to allege increased prices or reduced output.  Newsmax provides no facts to show any increased prices to consumers and alleges, at most, supposed "plans" by Fox to *potentially* increase rates to distributors for Fox News two years ago.  Compl. ¶ 42.

Even if Newsmax had alleged an actual price increase to distributors, "[p]rice increases occur for various reasons," and Newsmax alleges no facts plausibly suggesting that any price increases for Fox News involve supracompetitive pricing.  *Ducere*, 2025 WL 81373, at *5 (vague allegations of increased prices were "too thin to support an inference of [defendant's] monopoly" where plaintiff "allege[d] nothing about these [price] hikes to suggest they are out of the ordinary").

To the contrary, the Complaint suggests on its face a justification for price increases: "subscriber demand" for Fox News. Compl. ¶ 41. The assertions that any price increase "in the face of declining numbers of pay TV subscribers" must reflect market power, *id.* ¶ 42, and that "Fox News commands significantly higher carriage fees than any other cable news channel," *id.* ¶ 88, fail for the same reason. While subscriber numbers overall may be declining, "intense demand," *id.* ¶ 32, for Fox News explains any price increases. Newsmax itself, moreover, told the SEC that it increased prices in 2025, showing that price increases in themselves do not support market power. *See* Newsmax, Inc., Current Report (Form 8-K), at Ex. 99.1 (Aug. 19, 2025) (Ex. I).

Newsmax fares no better with the indirect method, which requires alleging "possession of a substantial percentage of the sales in a market." *Ducere*, 2025 WL 81373, at *4 (quoting *Valley Liquors v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir. 1982)). Newsmax asserts that "Fox captures 65% of the total-day cable news audience" and that the figure must be higher in the contrived "right-leaning market." Compl. ¶ 72; *see also id.* ¶¶ 43, 88, 94. None of those viewership numbers, however, reflects a "share" in the alleged "market for the *distribution* of right-leaning pay TV news." *Id.* ¶ 68 (emphasis added). The transactions in that market take place between programmers (like Fox and Newsmax) and distributors. Newsmax has not even attempted to provide figures suggesting shares of transactions in that market.

Moreover, two features of the distribution market Newsmax alleged and its relationship to viewership numbers bear some emphasis. First, when a distributor purchases Fox News, that does not imply forgoing a purchase of Newsmax. The allegations in the Complaint are consistent with *all* major distributors carrying *both* Fox News and Newsmax. *See supra* Part II.A.2.a. Second, viewers purchase channels from distributors in bundles, *see* Compl. ¶¶ 23, 68, and, as a result, when a viewer decides to watch Fox News rather than Newsmax (or CNN), that does not reflect a

"sale" to Fox News or a lost sale to Newsmax (or CNN). Instead, the viewer has already purchased distribution of *both* Fox News and Newsmax and has simply decided not to watch Newsmax at that moment. While viewership numbers are important for measuring consumer demand—and may affect the prices a programmer can charge to distributors and to advertisers—they do not reflect any "sales" or economic transactions at all, and certainly not transactions directly translating into a "share" of the market for "distribution of right-leaning pay TV news." *Id.* ¶ 68.

Courts in this Circuit routinely dismiss Section 2 claims for faulty market-share allegations like those Newsmax has provided. *See, e.g.*, *Organ Recovery Sys., Inc. v. Pres. Sols., Inc.*, No. 11-cv-4041, 2012 WL 2577500, at *11 (N.D. Ill. July 4, 2012) (market share allegations were "irrelevant" because they concerned a different market); *see Ducere*, 2025 WL 81373 at *3, *5 (rejecting market-share allegations limited to "control of Chicago-area pipelines" where plaintiff alleged market for "Canadian crude oil transportation services in the Chicago area").[21]

Even if Newsmax's 65% figure reflected a relevant market share, "allegation[s] of market share alone [are] insufficient" to survive a motion to dismiss. *Mitsubishi Elec. Corp. v. IMS Tech., Inc.*, No. 96-cv-499, 1997 WL 630187, at *6 (N.D. Ill. Sept. 30, 1997); *see PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) (per curiam) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").

And Newsmax's other allegations undermine any inference of monopoly power. For example, the Complaint is consistent with Newsmax being carried by every major distributor,

---

[21] *See, e.g.*, *Robinson v. HP, Inc.*, No. 24-cv-00164, 2025 WL 2802077, at *11 (N.D. Ill. Sept. 30, 2025) (dismissing Section 2 claim where "plaintiffs' complaint contains no allegations of HP's share in the market for HP-compatible ink cartridges"—the market alleged); *Hon Hai Precision Indus. Co., Ltd. v. Molex, Inc.*, 08-cv-5582, 2009 WL 310890, at *3 (N.D. Ill. Feb. 9, 2009) (similar).

which suggests robust competition in the market for "distributing right-leaning pay TV news." *See Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (Section 2 claim properly dismissed where existence of three competitors showed sufficient competition); *cf. GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189, 1203-04 (D. Colo. 2019) (dismissing Section 2 monopolization claim where "[plaintiff] itself entered the local market with some success").

In addition, Newsmax undermines any claim of market power by alleging that Fox relies on threats to black out *Fox Sports* to extract higher prices for *Fox News*.  Compl. ¶ 47.  If Fox News actually had "the ability to cut back the market's total output and so raise price" in the right-leaning news market, *Ind. Grocery*, 864 F.2d at 1414, Fox would have no need to leverage its *sports* programming to secure higher prices for Fox News.  *Cf. Organ Recovery Sys.*, 2012 WL 2577500, at *11 (allegations of price increases in other markets were "indicative only of [defendant's power] in" those markets).  "[W]here," as here, "plaintiffs fail to identify any facts from which the court can 'infer that the defendants had sufficient market power to have been able to create a monopoly,' their § 2 claim may be properly dismissed."  *Endsley*, 230 F.3d at 282 (quoting *Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 405 (7th Cir. 1985)).

B.    **Newsmax Fails Adequately to Allege Anticompetitive Conduct or Injury to Competition.**

Newsmax also fails to allege that Fox has "willful[ly] maintained" a monopoly through anticompetitive conduct.  The alleged contract terms addressed above fail to show anticompetitive conduct for a Section 2 claim for all the reasons already explained.  *See, e.g.*, *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("If … a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2.").

Newsmax does not add distinct allegations about injury to competition for its Section 2 claim, and its conclusory allegations about increased prices or reduced output fail for the reasons

explained above.  *See supra* Part II.A.2.b;  *cf. Chi. Studio Rental*, 940 F.3d at 978 (Section 2 claim dismissed for failure to plead injury to competition); *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1014 (E.D. Wis. 2010).

Newsmax's conclusory allegations about "threats and smear intimidation tactics to hurt or undermine the company and its executives," Compl. ¶ 63, do not suffice to show either anticompetitive conduct or injury to competition.  Those assertions complain only about purported injury to Newsmax (or its executives), not injury to competition.  *See, e.g.*, *Miller v. Nicholas*, No. 20-cv-5230, 2021 WL 9037639, at *3 (E.D.N.Y. Nov. 3, 2021) (dismissing antitrust claim where bald allegations of  "threatening conduct" were not accompanied by "any facts to support a conclusion that" these actions "had any effect on the competitive structure of the market").   And it is settled law that disparaging—even false—statements about a competitor are not actionable in antitrust.  *See Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851-52 (7th Cir. 2011).

In any event, these baseless accusations are not even factual assertions about things that happened to Newsmax.  Instead, Newsmax points to unproven allegations made by *someone else*— a now pro se plaintiff and former Fox employee named Andrea Tantaros who burned through ten sets of lawyers and had her claims rejected multiple times in multiple forums.  *See* Mem. of Law of Fox News Network LLC, et al. for Sanctions Pursuant to Rule 11, at 1-2, 3-7, 10, *Tantaros v. Fox News Network, LLC*, No. 1:25-CV-01675(VSB) (S.D.N.Y. Sept. 29, 2025), Dkt. 78 (Ex. J). Newsmax speculates that *maybe* something similar to what Tantaros imagines happened to her also happened to Newsmax here.  *See* Compl. ¶¶ 64-65.  Such speculation stacked on unproven allegations should be ignored.  A plaintiff "must plead his own claim and may not simply rely on what someone in some other case has alleged." *Murphy v. City of Chicago*, No. 01-cv-1802, 2001 WL 849744, at *3 (N.D. Ill. July 30, 2001).  Indeed, "paragraphs in a complaint that are either

based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009). Because the allegations related to Tantaros are wholly immaterial to Newsmax's claims, they should be stricken. *See* Fed. R. Civ. P. 12(f).

Newsmax comes no closer to alleging unlawful anticompetitive conduct with its complaint that in 2020 Fox News supposedly "encouraged" guests who appeared on Fox News not to appear on Newsmax. Compl. ¶ 66. Efforts to secure exclusive access to guests are no different from efforts to secure exclusive contracts for valuable inputs to a business. They reveal robust competition, not anticompetitive conduct. *Paddock*, 103 F.3d at 45 ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."); *see E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2004) (noting that "it is widely recognized that in many circumstances [exclusive dealing contracts] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all"). Newsmax does not and cannot claim that potential guests are so limited in number that Fox News cornered the market on them. *Cf. Paddock*, 103 F.3d at 44 ("There are hundreds, if not thousands, of opinion and entertainment features; a newspaper deprived of access to the *New York Times* crosswords puzzles can find others, even if the *Times* has the best known one.").

## IV.     Newsmax's Tying Allegations Fail to State a Claim.

Newsmax comes no closer to stating a claim by recycling its "drag-down" allegations as purported "unlawful block-booking." Compl. ¶ 103; *see id.* ¶¶ 99-107. That is an appeal to an outmoded tying analysis that turns on market conditions not alleged here. And as a tying claim, the allegations similarly fail under modern tying analysis.

## A.    Block Booking Is an Outmoded Tying Theory of Liability and Newsmax Fails to Allege Essential Elements for That Theory to Apply in Any Event.

"Block booking" as a category of antitrust analysis is largely outdated.  It refers to a tying arrangement used by movie studios in the 1940s and held unlawful in 1948.  *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156-57 (1948).  The studios refused to license films to theaters one-by-one, requiring theaters instead to purchase an entire "block" of films.  *Id.* at 156.

The analysis holding that arrangement unlawful rested on two key points.  First, block booking foreclosed competition by filling up a theater's limited capacity.  As the Southern District of New York explained in dissolving the *Paramount Pictures* decree, forcing the single-screen movie theaters of the 1940s to buy a block of movies "tied them up for weeks or months, thus foreclosing independent distributors." *United States v. Paramount Pictures, Inc.*, No. 19 MISC. 544 (AT), 2020 WL 4573069, at *4, *8 (S.D.N.Y. Aug. 7, 2020) ("*SDNY Paramount*").  Second, the Supreme Court treated each copyrighted movie, in effect, as a separate market in which the studio (as copyright owner) presumptively had market power that was leveraged to force purchases in the "market" for less-desired movies.  *Paramount Pictures*, 334 U.S. at 157-58.  In the 75-plus years since that decision, the Supreme Court has abandoned the market-power presumption for patent and copyright holders, *see, e.g.*, *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42-43 n.4, 45-46 (2006), and clarified that tying arrangements generally must be analyzed under the rule of reason.  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  As a result, "[t]he legal framework used to evaluate … block booking" has "changed" and "today, courts would analyze such restraints under the rule of reason."  *SDNY Paramount*, 2020 WL 4573069, at *6.

To the extent "block booking" continues to survive at all as a distinct mode of analyzing antitrust liability, Newsmax fails to allege essential elements for any such claim.

*First*, under rule of reason analysis Newsmax must define a relevant market, plausibly allege that Fox possesses power within it, and demonstrate that the challenged conduct produces anticompetitive effects. *See Agnew*, 683 F.3d at 335 (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006)). As explained above, Newsmax has failed to plead a relevant market, *see supra* Part I, and has failed to allege anticompetitive effects, *see supra* Part II. That dooms any claim under rule of reason analysis.

*Second*, Newsmax has not alleged the critical factor that gave rise to "block booking" in the first place—capacity constraints. For MVPDs and vMVPDs (unlike single-screen movie theaters) distribution is not a zero-sum game; distributors can and do carry both Fox News and Newsmax. *See supra* Part II.A.2.a. Newsmax has not alleged that capacity precludes distributors from carrying Newsmax if "drag-down" provisions kick in. It alleges only increased cost, *see* Compl. ¶ 55, which is not the same barrier to competition that "block booking" claims addressed.

*Third*, Newsmax also has not alleged the threshold requirement for "block booking"— namely, that Fox *required* distributors to license *something else* from Fox to license Fox News. The only thing *Paramount Pictures* "h[e]ld to be illegal is a refusal to license one or more copyrights unless another copyright is accepted." *Paramount Pictures*, 334 U.S. at 159. But here, what triggers the alleged requirement to "purchase" Fox's "low-demand channels" is the purchase of *Newsmax* (not Fox News). The allegations are simply a mismatch for a block booking claim.

### B. Newsmax's Allegations Otherwise Fail to State a Tying Claim.

Even analyzed as a tying claim, Newsmax's allegations fail. "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Siva*, 38 F.4th at 573 (quotation omitted). A tie is illegal only when the seller "exploit[s] … its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere

on different terms." *Jefferson Par.*, 466 U.S. at 12.  It is only when "such 'forcing' is present" that "competition on the merits in the market for the tied item is restrained."  *Id.* at 12.  The gravamen of a tying claim is the exploitation of power in the tying product market "to impair competition on the merits in another market."  *Id.* at 14; *accord Siva*, 38 F.4th at 573-74; *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592-93 (7th Cir. 2008).

Accordingly, a tying claim requires alleging "four elements": (1) that the tying arrangement "involve[s] two separate products or services"; (2) "that the defendant has sufficient economic power in the tying product market to restrain free competition in the tied product market"; (3) "that the tie affects a not-insubstantial amount of interstate commerce in the tied product"; and (4) "the defendant has some economic interest in the sales of the tied product."  *Siva*, 38 F.4th at 574 (quotations omitted).  Under these requirements, Newsmax fails to allege facts stating a tying claim.

*First*, Newsmax fails to define distinct markets for the "tying" and "tied" products.  *See generally Siva*, 38 F.4th at 575-76 (two markets required); *Sheridan*, 530 F.3d at 592; *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016).  Newsmax apparently intends Fox News to be the "tying" product in the alleged market for "Right-Leaning Pay TV News," Compl. ¶ 105, but does not describe a distinct market occupied by Fox Business and Fox Sports 2—or even explain whether they are in the same market or separate markets.  That alone is fatal for a tying claim.

*Second*, "the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works*, 547 U.S. at 46; *Sheridan*, 530 F.3d at 593-94; *Siva*, 38 F.4th at 574.  For all the reasons above, *see supra* Part I, Newsmax has failed to allege a plausible market for "right-leaning pay TV news," and failed to allege Fox's market power, *see supra* Part III.A; *see also Tangent Techs., LLC v. Recycled Plastics Indus., LLC,* No. 23-cv-261, 2024 WL 4007218, at *10 (E.D.

Wis. July 24, 2024) (dismissing tying claim for inadequate allegations of market power, including allegations "regarding the relevant market size" (citing *Sheridan*, 530 F.3d at 595)).

*Third*, Newsmax has not alleged the central requirement of a tying claim—that Fox *forces* distributors to purchase something that they did not want to purchase from Fox when they purchase Fox News. First, as noted, the alleged trigger here for additional purchases is purchasing *Newsmax* for the basic tier, not purchasing Fox News. *See* Compl. ¶ 54. In addition, "[a] tie within the meaning of antitrust depends on showing that the buyer did *not* want to take both products from the same vendor." *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 669 (7th Cir. 1985). But Newsmax alleges that distributors "generally agree" to carry Fox Business and Fox Sports 2 in a specialty tier, Compl. ¶ 53. All that Newsmax alleges is effectively a change in *price* for the same group of products (Fox News, Fox Business, and Fox Sports 2) that a distributor was purchasing anyway, *id.* ¶ 55 (alleging "additional license fees"). Even if the allegations potentially described using market power related to Fox News to secure a higher price, that does not state a claim for tying. *See, e.g., Brantley,* 675 F.3d at 1203.[22]

*Fourth*, Newsmax fails to allege "that the tie affects a not-insubstantial amount of interstate commerce in the tied product." *Siva*, 38 F.4th at 574 (quotation omitted). Newsmax does not even identify the tied product market and offers no allegations whatsoever about effects on competition in that market.

*Fifth*, Newsmax fails to allege antitrust injury to itself arising from injury to competition in the tied product market. The antitrust concern in tying doctrine is the "leveraging [of] power in one market to restrict competition in a second." *Id.* at 575. But Newsmax does not allege that it

---

[22] *See also Jefferson Par.*, 466 U.S. at 14 ("When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised.").

competes with Fox Business or Fox Sports 2 in the tied product market, or that it was forced to buy something in that market, or that it was injured by reduced competition in that market in any way.  Instead, Newsmax competes with Fox News in the *tying* product market.  That theory is simply backwards for a tying claim, and it confirms that Newsmax fails to frame a viable claim for tying.

## V. Newsmax's State Law Claims Fail for the Same Reasons As Its Claims Under the Sherman Act.

Newsmax's state law claims all arise under Section 133.03 of the Wisconsin Antitrust Act.  As this Court has noted, there is "substantial overlap between the determinations of liability under § 133.03 and the Sherman Act."  *Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968 (W.D. Wis. 2017) (Conley, J.).  Indeed, "[Section] 133.03 … essentially adopts the elements of an illegal antitrust conspiracy in the Sherman Act."  *Id.* at 968 n.12.  Accordingly, because the "interpretation of [Section] 133.03 [of the Wisconsin Antitrust Act] is controlled by federal court decisions under the Sherman Act," Newsmax's state claims all fail for the same reasons its federal claims fail.  *Medline Indus., Inc. v. Diversey, Inc.*, 563 F. Supp. 3d 894, 924 (E.D. Wis. 2021) (citation omitted); *see Prentice v. Title Ins. Co. of Minn.*, 500 N.W.2d 658, 662 (Wis. 1993) ("[W]e have stated many times that construction of [Section] 133.03(1) is controlled by federal decisions under the Sherman Act" (citation omitted)); *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1015-16 (E.D. Wis. 1999) (explaining that Section 133.03(2) "was intended as a reenactment of § 2 of the federal Sherman Antitrust Act," and that "Wisconsin courts have held that the state version is generally controlled by federal court decisions regarding the Sherman Act").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated:  November 25, 2025

Respectfully submitted,

*/s/ Ryan J. Walsh*

Bradley J. Bondi
Michael F. Murray
Benjamin Snyder
Ronald K. Anguas
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
Telephone: 202.551.1700
bradbondi@paulhastings.com
michaelmurray@paulhastings.com
bensnyder@paulhastings.com
ronaldanguas@paulhastings.com

Ryan J. Walsh
Amy Miller
**EIMER STAHL LLP**
10 East Doty Street
Suite 621
Madison, WI 53703
Telephone: 608.620.8346
rwalsh@eimerstahl.com
amiller@eimerstahl.com

Paul T. Cappuccio
Patrick F. Philbin
Cody L. Reaves
**TORRIDON LAW PLLC**
801 17th Street NW, Suite 1100
Washington, DC 20006
Telephone: 202.249.6900
pcappuccio@torridonlaw.com
pphilbin@torridonlaw.com
creaves@torridonlaw.com

***Attorneys for Defendants***